THOMAS C. RICCI, Plaintiff-Appellant, v. WILLIAM S. REED *et al.*, Defendants-Appellees.

First District (2nd Division) No. 87—1612

Opinion filed May 10, 1988.

---

*Justice Stamos participated in the decision of this case prior to taking office as a supreme court judge.

Bellows & Bellows, of Chicago, for appellant.

William J. Bolotin, of Phelan & Doyle, Ltd., of Chicago, for appellees.

JUSTICE BILANDIC delivered the opinion of the court:

Plaintiff brought this action to recover a $50,000 loan which he alleged was personally guaranteed by defendant, William S. Reed, president of defendant corporation. Following a bench trial, the court entered judgment against the corporate defendant for the amount of the loan plus interest but found William Reed was not personally liable for the loan. Plaintiff appeals from the judgment in favor of William S. Reed, individually.

In late January 1973, defendant William Reed approached plaintiff, Thomas Ricci, a member of the Chicago Mercantile Exchange

(hereinafter referred to as the Exchange), and requested that Ricci loan $50,000 to Reed & Company. At that time, Reed & Company, was having difficulty meeting the capital requirements for a clearing firm on the Exchange.

Initially, Reed suggested that Ricci purchase $50,000 of nonvoting stock in Reed & Company. Subsequently, Ricci chose to lend the money to Reed & Company in return for William Reed's personal guarantee. Ricci and Reed agreed that in lieu of interest on the loan, Ricci would clear his trades through Reed & Company, for Exchange fees only.

On February 5, 1973, Ricci loaned Reed & Company $30,000 by transferring the money from his trading account to Reed & Company. This was the first installment of the $50,000 loan. That same day, Reed gave Ricci a handwritten note as follows: "I.O.U. Mr. Tom Ricci, $30,000." This "IOU" was signed "William Reed" and witnessed by Peter Adan. Mr. Adan was the vice-president of Reed & Company at that time.

On or about February 20, 1973, Ricci presented Reed with an "Agreement for Sale and Assignment of Stock Interest." That written agreement embodied the initial proposal that Ricci was to purchase $50,000 worth of stock from Reed & Company and provided that Ricci could trade through Reed & Company at a commission rate no greater than fees charged by the Exchange.

Ricci, however, testified that he decided that he did not want to own nonvoting stock in a financially troubled corporation but, instead, would lend the money to Reed & Company on the condition that the entire loan be guaranteed by Reed in his individual capacity.

On February 21, 1973, Ricci transferred the remaining $20,000 of the loan to Reed & Company. At that time, Reed & Company was under financial pressure to obtain sufficient capital before the end of February in order to continue its business pursuant to Exchange rules.

Reed explained to Ricci that the Exchange rules required a lender to sign a subordinated loan document. Without the execution of a subordinated loan agreement, Ricci's $50,000 loan to Reed & Company would be unavailable for capitalization purposes. The testimony of Mr. Berry, financial officer of Reed & Company at the time, corroborated the urgent need for Ricci's money to be used to satisfy the capital requirements of the Exchange.

On February 28, 1973, Reed presented the subordinated loan agreement to Ricci. Ricci agreed to execute the agreement if Reed personally guaranteed the $50,000 loan. It is uncontested that Ricci

fully understood the ramifications of the subordinated loan agreement.

Reed handed Ricci a personal check for $50,000 made payable to plaintiff and bearing the notation: "Purchase of Loan to Reed & Co." Satisfied with Reed's personal guarantee and check, Ricci executed the subordinated loan agreement.

An interest provision contained in the subordinated loan agreement had been stricken pursuant to the agreement between Ricci and Reed that Ricci would trade for Exchange fees only, in lieu of interest, as long as Reed & Company was a clearing member of the Exchange and the loan remained unpaid.

Ricci continued to trade for Exchange fees through Reed & Company from February 1, 1973, until June 1974, at which time Reed & Company went out of business.

At trial, Reed claimed that he did not personally guarantee the loan. He stated that the notation on his check was not given to "buy" the loan, rather, he had made a "bad choice of words." He meant to give Ricci the option to take his money back. It is uncontested that Reed's "IOU" and check were executed in his individual capacity.

Mr. Berry testified that Reed & Company did not have sufficient funds to meet its Exchange requirements on February 28, 1973.

Subsequent to June 1974, Ricci demanded payment. Neither Reed & Company nor Mr. Reed paid the loan and Ricci filed this cause of action.

After a bench trial, the court found, *inter alia*: (1) while plaintiff's testimony was credible, Reed's personal guarantee fell within the Statute of Frauds (Ill. Rev. Stat. 1985, ch. 59, par. 1) as a matter of law; (2) the notation on Reed's personal check was insufficient to take the transaction out of the Statute of Frauds; (3) Reed executed the note in his individual capacity; (4) the $30,000 loan, evidenced by the "IOU" did not satisfy Reed's need for capitalization of $50,000; (5) the "IOU" was never intended to be an end of itself but was part payment of the $50,000 loan; and (6) the "IOU" merged into the subordinated loan agreement between the corporate defendant and plaintiff.

After a hearing on clarification of judgment, the court entered judgment in favor of plaintiff and against defendant Reed & Company in the sum of $50,000 plus statutory interest from the date of default on the loan and judgment for William Reed and against plaintiff. This appeal followed.

## I

 A trial court's determination on a guaranty agreement will not be set aside unless contrary to the manifest weight of the evidence. (*State Bank v. Cirivello* (1978), 74 Ill. 2d 426, 432, 386 N.E.2d 426.) Application of that standard to the facts in this case demonstrates that the trial court's determination was indeed against the manifest weight of the evidence.

 The first question is whether the facts bring this case within the Statute of Frauds (Ill. Rev. Stat. 1985, ch. 59, par. 1). The statute provides, in part:

> "That no action shall be brought *** to charge the defendant upon any special promise to answer for the debt, default or miscarriage of another person ***, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized." Ill. Rev. Stat. 1985, ch. 59, par. 1.

It is well settled that only a collateral promise is within the meaning of the term "special promise" in the statute. An original or independent promise is not a "special promise" within the statute. (*Swartzberg v. Dresner* (1982), 107 Ill. App. 3d 318, 324, 437 N.E.2d 860, *appeal denied* (1982), 91 Ill. 2d 581; *Bonner & Marshall Co. v. Hansell* (1914), 189 Ill. App. 474, 481.) When a promise to guarantee a loan to another is part of the consideration for the loan, the promise is "original" and does not fall within the purview of the Statute of Frauds. *Bonner*, 189 Ill. App. at 481.

 Illinois courts have generally distinguished between collateral and original promises, not from the particular words used, but from all of the circumstances of the transaction. 189 Ill. App. at 481-82.

If the promisor is a stranger to the transaction, without interest in it, the obligations of the statute are to be strictly upheld. However, if he has a personal, immediate and pecuniary interest in a transaction in which a third party is the original obligor, the courts will give effect to the promise. *Davis v. Patrick* (1891), 141 U.S. 479, 488, 35 L. Ed. 826, 828-29, 12 S. Ct. 58, 59; see also Annot., 35 A.L.R.2d 906 (1954).

In *Publishers Advertising Associates, Inc. v. Wessel Co.* (7th Cir. 1984), 747 F.2d 1076 (applying Illinois law), the court held that an oral promise by the sole shareholder and chairman of the corporation made to a creditor to provide financial assistance to the corporation and to guarantee the corporation's debts was not barred by the Statute of Frauds since the corporation owed no debt to the creditor at

the time the promise was made.

In the case *sub judice*, Reed's promise was original and not collateral. The record shows that Reed was the sole shareholder of the corporation. Ricci requested Reed's personal guarantee prior to lending the money to the corporation. In response, Reed signed the "IOU." Ricci again asked Reed for his personal guarantee of the entire $50,000 loan, and received Reed's personal check, before he signed the subordinated loan agreement.

Ricci's signature on the subordinated loan agreement was a prerequisite for Reed & Company to stay in business. Ricci was well aware of the financial difficulties Reed & Company was having. Indeed, Ricci would have not signed the subordinated loan agreement, nor would he have loaned Reed &˙ Company the money, without the personal guarantee of William Reed.

■ The rules of construction of contracts apply generally to contracts of guarantee. (*State Bank v. Cirivello* (1978), 74 Ill. 2d 426, 431, 386 N.E.2d 426.) The function of the court is to effectuate, if ascertainable, the intent of the parties to the contract. *Blackhawk Hotel Associates v. Kaufman* (1981), 85 Ill. 2d 59, 64, 421 N.E.2d 166.

Reed asserts that his personal check to Ricci gave Ricci the option to withdraw from the transaction. This assertion is not credible. If Reed personally had $50,000, it would not be necessary to borrow the money from Ricci. Reed could have loaned his own money to the corporation and subordinated the loan. Therefore, the check can reasonably be construed as a personal guarantee.

■ Where the language of a contract is unequivocal, it must be carried out according to its language. *United Airlines, Inc. v. City of Chicago* (1987), 116 Ill. 2d 311, 318, 507 N.E.2d 858.

The notation on Reed's personal check "Purchase of Loan to Reed & Co." is unequivocal. The notation clearly evidences Reed's intent to personally guarantee the loan. The notation on the check could not have possibly served any other purpose.

■ A contract of guarantee should be construed favorably to the creditor. (*Mahler Textiles, Inc. v. Woodka* (1929), 251 Ill. App. 177, 181-82.) Courts generally attempt to determine whether the words used—against the background of the circumstances which surrounded the use of those words—would cause the creditor reasonably to believe that the promisor had agreed to answer for a principal obligation on the part of another. 251 Ill. App. at 181.

Construing the guarantee most favorably to Ricci, and considering the circumstances surrounding the entire transaction, we conclude that Reed personally guaranteed the loan by Ricci to the corporation.

Accordingly, the judgment entered by the trial court, in favor of William Reed and against Thomas Ricci, must be reversed.

## II

 Absent an express agreement between the parties, allowance of prejudgment interest is permitted if the amount due is an amount fixed or easily computed. (*Cushman & Wakefield of Illinois, Inc. v. Northbrook 500 Limited Partnership* (1983), 112 Ill. App. 3d 951, 963, 445 N.E.2d 1313.) The evidence clearly shows the amount of the loan was $50,000. Accordingly, plaintiff is entitled to prejudgment interest pursuant to section 2 of the Interest Act (Ill. Rev. Stat. 1985, ch. 17, par. 6402) from the date of default.

For the foregoing reasons the judgment of the circuit court of Cook County entered in favor of William Reed and against Thomas Ricci is reversed, and the court is directed to enter judgment in favor of Thomas Ricci and against William Reed, individually.

Reversed and remanded with directions.

STAMOS* and SCARIANO, JJ., concur.

---

*Justice Stamos participated in the decision of this case prior to taking office as a supreme court judge.